[File No. 6551.]

STATE OF NORTH DAKOTA, Appellant, v. TOWNER COUN-
TY, a Public Corporation, Respondent.

(283 N. W. 63.)

Opinion filed December 13, 1938.

*Alvin C. Strutz,* Attorney General, and *C. E. Brace,* Assistant Attorney General, for appellant.

*J. J. Kehoe,* State's Attorney, for respondent.

BURR, J. There is no dispute as to the facts in this case. The land involved herein is part of the permanent school fund of the state of North Dakota created by the United States grants and otherwise; and the state of North Dakota is, and at the time of the commencement of this action was, the owner in fee of said land. In November, 1919, the board of university and school lands sold this land to J. F. Thomas, the purchase price being $6,400.00. The purchaser paid $1,280.00 on the purchase price at the time of sale and agreed to pay the remainder in four equal payments, with interest at 6%, but defaulted in the payments, and on or about January 12, 1925, the contract was duly canceled.

During the years 1920 to 1924, inclusive, the defendant levied annual taxes against the land, and "no part of said taxes have been paid and the same still stands of record in the offices of the treasurer and the county auditor of the defendant."

The complaint sets forth these facts narrated and alleges that the defendant claims a lien on the premises for the taxes assessed against the premises while they "were in the possession of the said J. F. Thomas or his assigns under and by virtue of the contract aforesaid."

The complaint is in the statutory form for determining adverse claims and prays that title be quieted in the plaintiff and any claim made by the defendant be adjudged null and void and that defendant "be required to cancel the said taxes upon the tax lists of the said defendant county."

The answer admits these facts as found by the trial court and the issue is narrowed to the question of the status of the taxes levied and unpaid.

The trial court found that these taxes are valid liens against the premises, "co-equal to the interest in said premises owned by the plaintiff; that both are valid co-equal claims against said land and that neither party can shut out the other." Judgment was entered in accordance with this finding and the plaintiff appeals.

While the findings are somewhat indefinite as to the origin of plaintiff's interest in the land, the defendant, in its brief, shows that the land involved was part of the United States grant given to the northern part of the territory of Dakota under the Enabling Act organizing such portion of the territory into the state of North Dakota;

and was accepted by the state of North Dakota under the terms of the offer as part of the school fund of the new state.

The Enabling Act, § 11, provided: "That all lands herein granted for educational purposes shall be disposed of only at public sale, . . . the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools. . . ."

The compact with the United States, as set out in Article 16, § 205, of the state Constitution, accepted the grants under their terms, and, in addition, further safeguarded the grants by the constitutional provisions hereinafter referred to.

Section 153 of the Constitution made all proceeds of the public lands and other proceeds given for the school purposes a special fund and provided that it "shall be and remain a perpetual fund for the maintenance of the common schools of the state. It shall be deemed a trust fund, the principal of which shall forever remain inviolate and may be increased but never diminished. The state shall make good all losses thereof."

While the term "fund" may at times be popularly supposed to refer to moneys and credits etc., this matter is set at rest by our Constitution, as in § 159 of the Constitution it is provided that "all *land, money or other property* . . . granted or received from the United States . . . for a university . . . *or other educational or charitable institution or purpose* . . . shall be and remain perpetual funds. . . ."

The Constitution also makes provision for adding to this fund, "and no part of the fund shall ever be diverted even temporarily, from this purpose or used for any other purpose whatever than the maintenance of common schools for the equal benefit of all the people of the state . . ." § 154 of the Const.

Section 155 of the Constitution authorizes the legislative assembly to provide for the sale of all school lands subject to the provision of the article. Section 156 of the Constitution creates the "Board of University and School Lands," and provides that, "subject to the provisions of this article and any law that may be passed by the legislative assembly, said board shall have control of the . . . sale . . . and disposal of all school and university lands . . ." under

limitations set forth in § 160 as to the method of appraisal and keeping of accounts.

Section 158 of the Constitution as originally adopted provided that upon sale of school lands to private parties, "No grant or patent for any such lands shall issue until payment is made for the same; provided, that the lands contracted to be sold by the state shall be subject to taxation from the date of such contract. In case the taxes assessed against any of said lands for any year remain unpaid until the first Monday in October of the following year, then and thereupon the contract of sale for such lands shall become null and void."

This section was subsequently amended, and with reference to cancellation provides that upon default in payment of taxes the contract of sale "shall, if the board of university and school lands so determine, become null and void. . . ." Subsequent amendments did not alter these provisions in any respect involved here and in the case at bar the board of university and school lands did determine and declare the contract with Thomas null and void.

The constitutional provision contained in § 158 and amendments, to the effect that the land sold "shall be subject to taxation from the date of such contract" is not self-executing. It requires the action of the legislative assembly to put it into execution. This is also the clear import of the intent of Congress as shown by the Enabling Act, which, while in § 11 requires a public sale at a minimum price, makes no attempt whatever to legislate as to the method of sale or method of the investment of the permanent school fund, and specifically prescribes that the lands may be leased, "under such regulations as the legislature shall prescribe." In § 17 of the Enabling Act, after making provision for a grant of 170,000 acres of land to the new states of North and South Dakota "for such other educational and charitable purposes as the legislature of said state may determine," Congress provided: "The lands granted by this section shall be held, appropriated and disposed of exclusively for the purposes herein mentioned, in such manner as the legislatures of the respective states may severally provide." Congress recognized the necessity for legislative action to carry the grants into effect, but subject to the conditions under which the grants were made.

The legislature, in accordance with the power conferred upon it by

the Constitution, enacted a comprehensive law dealing with the appraisal and sale of the school lands, which law incorporated many of the constitutional provisions, and many of the terms and conditions laid down by the United States at the time of the grant. The statute provided that "the lands so contracted to be sold by the state *shall be subject to taxation from the date of such contract and the taxes assessed thereon shall be collected and enforced in like manner as against other land.* Provided that in case the taxes assessed against any of said lands remain unpaid until the first Monday in October of the following year then and thereupon the contract of sale for such lands shall, if the board of university and school lands so determine, become null and void. Provided further, that when a contract is not declared null and void by said board for failure to pay taxes before the time provided by law for the sale of land for delinquent taxes, any lands upon which taxes are delinquent at the time of such tax sale may be sold for delinquent taxes as other lands are sold, and the purchaser at such tax sale of any such lands so sold shall only acquire, by virtue of such purchase, such rights and interests as belong to the holder and owner of the contract of sale issued by such commissioner under the provisions of this article, and the right to be substituted in the place of such holder and owner of such contract of sale, as the assignee thereof; and upon the production to the proper officer of the tax certificate given upon such tax sale, in case such lands have not been redeemed, such tax purchaser shall have the right to make any payment of principal or interest then in default upon such contract of sale as the assignee thereof. But no tax deed shall be issued upon any tax certificate procured, under the provisions of this section while the legal title of said lands remains in the state of North Dakota. Whenever the contract for the sale of any of said lands has been cancelled, it shall be the duty of the commissioner to notify the auditor of the county in which such lands are located, of said cancellation, and thereafter such lands shall not be listed for taxation, but, in the event of the redemption of any such lands, the redemptioner shall pay as taxes, in addition to all other charges, an amount equal to the tax last levied thereon for each year such land was not listed for taxation, together with such interest and penalty as would have been charged, if the same had been regularly listed and taxed." Comp. Laws, § 325.

Section 176 of the Constitution at the time of its adoption and through all subsequent amendments has contained this provision: "The property of the . . . state . . . shall be exempt from taxation; . . ." and also a provision to the effect that taxes shall be levied by uniform rule.

It is the contention of the respondent that the constitutional provisions as set forth in § 158 of the Constitution and subsequent amendments contemplate that upon the sale of school land under contract the land itself becomes subject to taxation the same as if the purchaser was the owner of the land in fee simple; while the plaintiff asserts that the whole theory underlying the grant of public lands from the United States to the state for school purposes and the constitutional provisions of the state with reference to the land is based upon the assumption that only the interest of the purchaser in the land is subject to taxation; that this theory is the only one that will harmonize constitutional provisions and is the clear intent of the Constitution and of the legislative assembly.

Section 325 of the Compiled Laws shows clearly that it was but the interest of the purchaser in the land which was subject to the lien for taxes. It is true the section says, "The lands so contracted to be sold by the state shall be subject to taxation . . . ;" but the subsequent provision in the same section to the effect that upon the sale of the land for the collection of delinquent taxes the purchaser at the tax sale acquires only whatever right and interest the holder and owner of the contract has in the land, shows clearly to what interest any lien for taxes attaches. The purchaser has the right to be substituted in place of the contract owner. When the time of expiration of the period of redemption arrives, the holder of the tax certificate does not get a tax deed. He acquires the right to make any payment of the principal or interest in default and therein is substituted for the owner of the contract. His rights as against the state are governed by the terms of the contract. If he defaults in the terms, the contract is subject to cancellation. In other words, when one purchases such land at a tax sale, he takes the risk of the owner of the contract redeeming from the tax sale, and otherwise he has the right to carry out the contract. In such case if he defaults he loses the amount of money he has paid at the tax sale. The board of university

and school lands has still the right to declare the contract void for failure to make the payments required by the contract, and the contract may be declared null and void for failure to pay taxes. Comp. Laws, § 325.

Section 315 of the Compiled Laws made provision for the disposition of the rights of the owner of the contract when the land was levied upon or attached in an action to recover a debt, and the purchaser at a sale under such proceedings obtained merely the interest of the owner of the contract.

The law announced in Sox v. Miracle, 35 N. D. 459, 472, 477, 160 N. W. 716, 720, and School Dist. v. Hefta, 35 N. D. 637, 640, 160 N. W. 1005, 1006, is not in conflict with the rule laid down here. These cases involved the relationships between the purchaser and those claiming under him. The Constitution clearly recognizes the right of the owner of a contract to assign his interest and that his interest is subject to the same vicissitudes as that of any other person purchasing land under an executory contract. The cases in no way affect the status of the state as custodian of the school fund and its right to have its interest totally exempt from taxation.

If the contract was canceled because of the failure of the owner of the contract to make the payments, or the failure of the purchaser at the tax sale to make the payments, then the purchaser at the tax sale lost the investment which he had made at the tax sale. Clearly, this was the legislative intention for in 1923 the legislative assembly, by chapter 324 of the Session Laws of 1923, being § 2193a of the Supplement, provided that a purchaser at such tax sale, in case the contract thereafter was canceled by the state, could secure a refund of the taxes which he paid and the subsequent taxes paid, with interest. As to the relative rights of parties to such a contract for the purchase of school land, see Petters & Co. v. Nelson County, ante, 471, 281 N. W. 61, 63. The amendment by chapter 264 of the Session Laws of 1927 prohibited the application of this principle to the abatement of hail indemnity tax and reduced the rate of interest which was recoverable; while the amendment by chapter 245 of the Session Laws of 1929 makes the provision for refund applicable to hail indemnity charges paid.

When a contract is canceled, the land is no longer listed for taxa-

tion. Being the property of the state, it may not be taxed. But though the contract be canceled, provision is made for redemption. The state may permit the owner of the contract to redeem, provision being made for penalty in lieu of the taxes which otherwise would have been levied.

It was clearly the legislative intent that after such land had been assessed for taxation purposes and sold at tax sale for delinquent taxes the county would bid the same as any private person. In such case, if the contract was subsequently cancelled so that the interest of the contract owner was terminated, it was provided that all "taxes against such land shall be abated." See § 2193a, Supplement.

Such provisions show, therefore, that it is only the interest of the contract owner that is subject to the lien of taxation; that such interest may be sold at tax sale to satisfy the delinquent taxes; that the county, as well as a private individual, may become the purchaser of such interest at tax sale; that in case the contract owner defaults in the payment of taxes, or of principal, or of interest, the private individual who purchases at tax sale may complete the contract and obtain the land; that in case the contract is canceled and he fails to complete the contract he will get a refund of the sum paid at the tax sale, and if the county be the purchaser at tax sale the taxes for which the land is sold are abated.

This is the clear legislative policy. Respondent argues that such construction of the constitutional provisions and of the subsequent legislation violates the constitutional provision that taxes shall be uniform on all property, and therefore this construction is unjust to the private owners of land situated in the same taxing district.

It must not be overlooked that such land, until sold, is not subject to taxation whatever, and in such case private owners of land within the taxing district are in the situation where their land is taxed and the school land not taxed.

The state does not tax its own property, and had the legislative assembly failed to provide a means for taxing the interest of the purchaser, in the view of the writer the land would have been as free from taxation until title passed as would land held under the homestead laws of the United States.

The constitutional provision found in § 176 that "Laws shall be

passed taxing by uniform rule all property . . ." except that of the United States, the state, etc., permits classification. State land is not in the same class as privately owned land. The constitutional provision is not violated by the withdrawal of state land from taxation. As state land it may lie dormant for decades, and yet the privately owned land situated within the taxing district be subjected to tax burden for the purpose of carrying on governmental purposes in school and township government. As soon as sold the land goes on the tax list. The purchaser pays taxes the same as if he owns the land. He makes his payment for the land to the state, and if subsequently the contract be cancelled, the state still holds the land, but is enriched by whatever payment the contract owner had made both in taxes and principal and interest. The county is merely a subdivision of the state and is one of the agencies used to ascertain and collect the amount of taxes. The state does not tax itself. The purpose of taxation is to raise revenue. The clear policy of this state is as hereinbefore set forth.

To hold that this land is still encumbered with a tax lien is in effect holding that the state taxes itself, and even though respondent admits the right to enforce is at least suspended and could not be asserted until after there is a resale, nevertheless such sale would be affected in some manner by this lien. The taxes claimed to be due are taxes due to the state, either directly or to its subdivisions. Thus, the claim for unpaid taxes is in fact the claim of the state for taxes against its own property for upon the cancellation of the contract the land involved was the property of the state exactly as if it had never been sold. As stated in State v. Locke, 29 N. M. 148, 156, 219 P. 790, 792, 30 A.L.R. 407, "when property is acquired by the state in its sovereign capacity, it thereupon becomes absolved, freed, and relieved from any further liability for taxes previously assessed against it, and which are unpaid at the time it becomes so acquired that from the moment of its acquisition the power to enforce the lien is arrested or abated. The claim of the state for such taxes becomes merged in its ownership of the fee."

This view is very persuasive when we consider the nature of the trust involved. The state can not permit its interest in the land held

in trust for specific purposes to be burdened by its own tax to carry on the general governmental purposes of the state.

The state is entitled to judgment declaring it to be the owner of the land involved clear and free of all liens and claims on the part of the defendant. To the extent, therefore, in which the judgment of the lower court held the county had a lien which was co-equal to the interest of the state, the judgment appealed from is modified and as modified is affirmed.

CHRISTIANSON, Ch. J., and MORRIS, SATHRE and NUESSLE, JJ., concur.